Axel S. Stokby v. Commissioner.
Axel S. Stokby v. Commissioner
Docket Nos. 21145, 24870.
United States Tax Court
1953 Tax Ct. Memo LEXIS 186; 12 T.C.M. (CCH) 761; T.C.M. (RIA) 53236; June 30, 1953
*186 Bertram L. Roberts, Esq., for the petitioner. John J. Madden, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These proceedings are brought for redetermination of deficiencies in income tax of $24,912.29, $41,391.97, and $16,634.77 for 1943, 1944 and 1945, respectively. The year 1942 is pertinent because of the Current Tax Payment Act. The returns for the years in question were filed with the collector for the second district of New York. The issues presented are whether the income of a business carried on in the name of the Stokby Company for 1942, 1943, 1944, and 1945 is taxable to petitioner; the amounts of deductions to which petitioner is entitled for these years as travel, entertainment, and general expenses; and whether petitioner is entitled to a deduction for 1945 of an amount paid toward developing and securing a patent. Other assignments of error appear in the petition, but no evidence has been introduced relating to them, and they are deemed abandoned. Findings of Fact The Danish Trading Company, Inc., was incorporated in 1938, at which time petitioner was its vice president. About March 1, 1939, petitioner *187 took over from the other stockholders of Danish Trading Company, Inc., and became its president. At that time, Danish Trading Company, Inc., was engaged in the business of importing meats and other food and suede leather from Denmark. Early in November, 1939, 80 shares of stock in Danish Trading Company, Inc., were issued to Edith Stokby, petitioner's wife, 19 shares to petitioner, and one share to Lauritz Smidt. The certificates evidencing the shares of Edith were endorsed in blank by her, the endorsement not being dated. A stock certificate dated June 11, 1945, (after the dissolution of the Company, as hereinafter set forth), for 14 shares was filled out to Ted K. Franck, Edith's son by a prior marriage, and was endorsed in blank. Other certificates for previously issued stock were in the stock book, but were not endorsed in blank. In 1941 and 1942, on applications for licenses to engage in foreign exchange transactions and in the consideration thereof, Edith was listed as an American naturalized citizen holding 80 per cent of the stock of Danish Trading Company, Inc., and petitioner was listed as a Dane holding 19 per cent of the stock of Danish Trading Company, Inc.
Petitioner *188 became a citizen of this country in the summer of 1947. Edith Stokby, petitioner's wife, was employed by the Danish Trading Company, Inc., prior to her marriage to petitioner on December 17, 1938, in Denmark. Before her marriage to petitioner she was Edith Franck. Some time between fall of 1938 and February, 1939, when petitioner and Edith were in Denmark, they visited a brother-in-law of Karl Moeller Nielson, who informed the Stokbys that Nielson was in Brazil where he was building a large meat-packing establishment. Edith had known Nielson earlier when he had been in the United States. At petitioner's request, sometime after the Stokbys had returned to the United States, Edith wrote to Nielson in Brazil. World War II started in September, 1939, and prospects of future trade with Denmark were not good. The letter to Nielson was an effort to secure other sources of merchandise. The letter to Nielson sought him to use his good offices in securing an agency from Frigorificos Nacionals Sul Brasliloiros, Ltd., (hereinafter referred to as Frigorificos or Frigos), for the Danish Trading Company, Inc.
After correspondence by Edith and the Danish Trading Company, Inc., with Frigorificos, *189 in July, 1940, Danish Trading Company, Inc., was appointed as agent for Frigorificos for the Atlantic and Gulf ports of the U.S.A. Some orders of merchandise were received from Frigorificos by Danish Trading Company, Inc.
Approximately one month after World War II started in Europe, Denmark was invaded and Danish Trading Company, Inc., received no more merchandise from Denmark. Frigorificos objected to shipping to the Danish Trading Company, Inc.
In October, 1942, a Certificate of Dissolution of the Danish Trading Company, Inc., was filed with the Secretary of State of New York. At that time it had no assets. Petitioner asked his attorney to reincorporate Danish Trading Company, Inc., in 1945. Under date of September 25, 1941, a Certificate of Conducting Business was filed with the Clerk of the Supreme Court, New York County, whereby Edith Stokby certified that "she intend [intened]" conducting business under the name of Stokby Company. Stokby Company engaged in some business in the latter part of 1941. The income resulting from the operation of the Stokby Company in that year was reported on the income tax return filed by petitioner for that year. Petitioner's wife was claimed *190 as an exemption on petitioner's income tax return, on which he is stated to be in the business of "Commission Merchant." She filed no income tax return for that year. Stokby Company books set up a capital account as of January 1, 1942, on which Edith Stokby was denominated the "proprietor." The initial entry disclosed a January 1, 1942, balance of $5,648.60, which was derived from the latest entries from the previous ledger book for the business conducted during the latter part of 1941. Edith Stokby paid petitioner nothing for this transfer. Petitioner, as an alien, experienced difficulty doing business because of various governmental regulations affecting him. He informed his accountant that it was because of this that Stokby Company was operating under the name of Edith Stokby. Stokby Company, sometime in 1941, began acting as agent for Frigorificos. No transfer of the agency from Danish Trading Company, Inc., appears of records. Stokby Company also imported bristles and cattle hair from Oderich-Vetter in Brazil. Stokby Company opened an account with the Chase National Bank in September, 1941, when Edith was the only one who could sign checks alone. A power of attorney was *191 given to petitioner on January 27, 1943, to also sign alone. Edith Stokby signed checks on "Stokby & Company" during October, 1941. The greater portion of the checks on the Stokby Company bank account was signed by petitioner. During 1942, Edith signed 10 such checks; during 1943 she signed one, and during 1944, none. During 1943, Stokby Company gave notice for loans from that bank, which notes were signed by Edith Stokby. During 1942 through 1945, inclusive, Edith Stokby was not listed in the Manhattan telephone directory, but both petitioner and Stokby Company were listed from the same address and with the same telephone number. A letter of February 2, 1943, to petitioner from the Manufacturers Trust Company of New York, requested the signature of Edith Stokby to a letter as "necessary since Mrs. Stokby is the registered owner of Stokby Company and has executed a power of attorney to you." During 1943, insurance policy amendments indicating that the policies were issued to "Edith Stokby doing business as Stokby Company" were signed by petitioner. A letter of December 28, 1942, relating to membership in an importers' association asked for an application in the firm name, *192 signed by Mrs. E. Stokby. In a letter dated November 9, 1944, by an attache of the Brazilian Embassy to Pan American Airways System, petitioner is described as general manager and Edith as proprietress of the Stokby Company. Petitioner sometimes was known and held himself out as the general manager of Stokby Company. He was in charge of Stokby Company's money. In August, 1943, petitioner and his wife opened a savings account at the New York Savings Bank. The information furnished the bank, relating to her, noted "Occupation at home." Petitioner's occupation was noted as "Importer." Edith Stokby sometimes came to the place of business of Stokby Company two or three times a week, and spent two hours to all day there. She knew the customers of Stokby Company and assisted in entertaining them. The participation of the United States in World War II commenced December 8, 1941, and continued until August, 1945. During the years in question, Government regulations, including limitation and allocation of shipping space, made importations of meats and bristles from South America difficult. Government agencies also had strict regulations on meat importation and labeling. Shipments *193 were slow and were sometimes rejected for entry into the United States, and the meat had to be sold elsewhere. The Armed Forces took much of the imported meat for their own use. Most of the corned beef imported into this country after 1942 was requisitioned for the Armed Forces. Stokby Company imported substantial quantities of meat for export only. Stokby sold a European supply mission over $250,000 worth of meat in 1944 which it had imported in 1943 at a cost of about $150,000. During 1942, Stokby Company was attempting to obtain delivery of orders of meats and bristles from Brazil. Frigorificos was slow getting its new plant in operation. Hams and picnic hams were not obtainable from Brazil until some time in 1945. It was impossible to get a license to import hams into the United States, and they were only imported to be sold for export. No purchases of frankfurters or liver paste appear on Stokby Company purchase ledgers which could be identified as frankfurters or liver paste until September, 1943. After purchases in September, 1945, of 1,000 cases of corned pork from Frigorificos, "the curtain went down from Frigorificos." Substantial quantities of bristles were imported *194 by Stokby Company from Oderich-Vetter in South America. These bristles were in great demand in this country. Our Government agencies were urging and assisting in the importation of as many as possible. During the years in question, petitioner and Edith entertained customers and others important to the business life of Stokby Company, at their home, at restaurants, clubs, and hotels in New York and elsewhere. During 1942 and the early part of 1943, Stokby Company had very few actual customers outside the New York City area, and practically no actual customers outside the eastern part of the United States. Petitioner and his wife took a transcontinental tour of the United States in 1943, from May to August. They spent some of the time in resort areas. During this trip potential customers were visited in the many and various places where they stopped, and business was solicited for South American goods and for Danish goods when shipment could be resumed. Some of the South American products were made in accordance with Edith Stokby's family recipes, and Edith Stokby sometimes told of the high quality of Danish food products and the attempt to duplicate such goods in South America. *195 In 1942 and 1943 Ernesto Oderich, Managing Director of Frigorificos, and a partner in Oderich-Vetter, visited the United States in order to facilitate shipping and to secure tin plate for Frigorificos. Without this tin plate it could not pack or ship its products to Stokby. Since it was difficult to take dollars out of Brazil, the Stokby Company paid the expenses in the United States of Oderich for several months and charged those expenses to travelling and entertainment. While here, Oderich accompanied petitioner on visits to customers and potential customers. During this period, and at other times, petitioner made business trips to Washington. E. Feder, who was working for Stokby Company, made expenditures in its behalf for travel and business entertainment, for which he was reimbursed. The Stokby Company also charged to travelling and entertainment expenses the salaries of a chauffeur who was hired to drive Oderich and other individuals, such as representatives of the Brazilian Government who were cooperating with petitioner in his business transactions. Arayjo incurred expenses on behalf of the Stokby Company, including expenses for overseas telephone. In connection with *196 the sale of the meat to the French Purchasing Commission on January 19, 1944, for approximately $250,000, petitioner and his wife went to Palm Beach, Florida. They spent from January 13 to February 19, 1944, there. Petitioner, while there, also made visits to large and small packers. Petitioner entertained lavishly at all times, and charged this entertainment to expense items on the books of the Stokby Company. The entertainment by petitioner of United States and foreign government personnel, whom he also contacted officially, was extensive. The Stokby Company was merely an agent in so far as the importation of bristles was concerned. All the bristles imported by it had to be turned over to Fred N. Cone Company, and were not for resale in this country by the Stokby Company. From January to April, 1945, petitioner and his wife were on a trip to Brazil and Uruguay. The stated purposes of this trip were to negotiate about 30,000 cases of ham and corned pork in a warehouse at Santos; to secure a ship to take meat products of Frigos to the United States; to explain U.S.A. regulations on meat products to Frigos, and to look into the situation with respect to bristles. Petitioner attended *197 to these matters, and he and his wife visited many plants relating to the business in Brazil. Petitioner conferred with high government officials. The expenses of this trip were charged to the Stokby Company business. They included such items as cost of putting a refrigeration plant in the ship "Frega", including the expenses of technical advisors in connection with the refrigerating system and a month's stay in Uruguay. The Stokby Company had no substantial business transactions, during the periods herein involved, with anyone in the latter country, but while petitioner and his wife were in Uruguay some negotiations for prospective business took place. The efforts to secure the use of a ship to transport meat from Frigos to the United States called for ultimate approval by the proper United States Government official in Washington, D.C., and petitioner secured the necessary permission only after his return from South America. In August of 1945 petitioner and Edith Stokby went to Denmark. Petitioner and his wife were anxious to see their relatives in Denmark. They were worried about their safety during the German occupation of Denmark. They stayed abroad until March of 1946. *198 On this trip, petitioner rested. He also saw people on business and again spent money lavishly, and from August to November, 1945, in excess of $10,000 was charged on the books of Stokby Company for travel expenses. Petitioner, during the years in question, was always engrossed in business and potential business, and was always alert to promote sales, increase sources of supply, find new products, secure import authorization, and increase potential post-war business. He did this wherever he travelled, including, in addition to the foregoing travels, trips to New England, New York, and Canada. On all the foregoing trips, the presence of Edith Stokby was not required or necessary for the business. Stokby Company purchased cigars in quantity during the periods in question, which cigars were encased in cellophane wrappers bearing the inscription "Stokby Company." Some of the cigars were given to customers. Stokby Company, from time to time, expended money for liquor and flowers for customers. Stockby Company expended money for expenses of moving from one rented office to another. Stokby Company also expended money during the periods in question for payments to clubs where *199 customers were entertained. Stokby Company also paid automobile expenses for petitioner's car which was used, in part, for the business of Stokby Company. During the year 1942, petitioner had ordinary and necessary business expenditures for travel, entertainment, and "other general" expenses as follows: Automobile expenses
$ 300.00
Cigars
300.00
Club
30.00
Cash (reimbursed)
1,000.00
Reimbursement to Feder
225.00
Flowers
20.00
Travel
300.00
Liquor
150.00
Miscellaneous
170.00
Oderich
234.00
During the year 1943, petitioner had ordinary and necessary business expenditures for travel, entertainment, and "other general" expenses, as follows: Automobile expense
$ 300.00
Cigars
450.00
Club
415.00
Moving expenses
82.50
Oderich
1,800.00
Arayjo
1,580.52
Liquor
100.00
Travel
1,800.00
Cash (reimbursed)
1,700.00
Miscellaneous
156.77
During the year 1944, petitioner had ordinary and necessary business expenditures for travel, entertainment, and "other general" expenses, as follows: Automobile
$ 300.00
Cigars
260.00
Club
570.00
Cash (reimbursed)
5,000.00
Travel
750.00
Flowers
20.10
Arayjo
1,850.00
Miscellaneous
369.25
*200 During the year 1945, petitioner had ordinary and necessary business expenditures for travel, entertainment, and "other general" expenses, as follows: Automobile
$ 204.00
Club
510.00
Cash (reimbursed)
1,700.00
Miscellaneous
200.00
Travel
5,500.00
In 1945, $2,500 was paid to Karl Moeller Nielson and deducted as a part of general expense. It was paid in connection with attempts to develop, and to secure a patent on, a machine for slaughtering cattle. The attempt to develop and patent this machine was finally abandoned in 1952. The net profits of Stokby Company, a proprietorship, were reported by Edith Stokby, and included, by respondent, in petitioner's income, for the years and in the amounts as follows: 1942
$ 6,830.95
1943
22,663.21
1944
35,773.00
1945
7,630.19
Respondent disallowed travel and entertainment and general expense for the years and in the amounts, as follows: Travel and
General
Entertainment
Expense
1942
$ 3,060.52
$ 387.75
1943
10,387.78
903.22
1944
13,166.83
3,100.00
1945
17,355.08
Respondent also disallowed the deduction, as a current expense for 1945, of $2,500, relating *201 to the machine for slaughtering cattle. For the years indicated, Edith Stokby took deductions for Stokby Company for travel and entertaining and "other general" expenses, as follows: Travel and
General
Entertainment
Expense
1942
$ 4,363.62
$ 555.16
1943
12,407.14
999.70
1944
16,239.38
5,415.57
1945
19,298.58
2,782.77
During the calendar years 1942 to 1945, inclusive, petitioner ran the business of the Stokby Company, and its success and income were primarily attributable to his personal services. The transfer of the business to his wife had no reality. Opinion The above findings are dispositive of the two primary issues in the case - the taxability of the income of the Stokby Company to petitioner, and the determination of the amount of expenses to which he is entitled for the years in question. Neither party excepted formally within the meaning of Tax Court Rule 48 to the proposed evidentiary findings of the Commissioner, and they have accordingly been adopted verbatim. Petitioner chooses instead to complain against the Commissioner's failure to find in accordance with certain of petitioner's proposed findings. Without discussing in *202 detail the obvious objections both to this procedure and to the findings as proposed by petitioner it suffices to point out as examples, that petitioner asks for a finding of an expenditure in the amount of $3,000, when the testimony was that but $300 was spent, and in the amount of $2,500, when only $25 was expended according to the testimony introduced on behalf of petitioner himself. We cannot, as we have said, consider these appropriate exceptions to the Commissioner's findings on the evidentiary facts; but if they are such the record fails to support them. Although petitioner relies on the cases dealing with family partnerships as analogous, we are convinced that the case at bar is a problem of assignment of income, and we see no escape from the conclusion that the business depended upon the personal services of petitioner, and that petitioner was the moving factor, motivating source, and the true earner of this income. While his wife might be characterized as a most satisfactory helpmate, the record fails to establish that she did anything more than what might be expected from an interested wife. Petitioner earned the income in question, and it is taxable to him. See Foster G. Beamsley, 18 T.C. 988; *203 Lucas v. Earl, 281 U.S. 111. Moreover, even under the cases cited to support petitioner's position of a transfer of the business to his wife, we are unable to conclude that he has sustained his burden of establishing the reality of such a transfer. See Commissioner v. Culbertson, 337 U.S. 733. That it was petitioner who earned the income leads to the further conclusion that the amounts indicated in the above findings, as expended by petitioner for travel, entertainment, and general expenses during the years in question, be limited to disbursements for his own account, exclusive of travel expenses for his wife. There remains the matter of $2,500 paid to Nielson in 1945 in connection with the promotion of a machine for slaughtering cattle. Although there may be possible circumstances under which payments of this sort might be deducted as expenses of the business, petitioner has failed to show that the expenditure or any part of it was not a capital item, within the meaning of Hart-Bartlett-sturtevant Grain Co., 12 T.C. 760. This effort was not finally abandoned until 1952, thus rendering inapposite such cases as Homer L. Strong, 14 B.T.A. 902, *204 where expenditures and abandonment all took place in the same year. Decisions will be entered under Rule 50.